# CASES ADJUDGED IN THE UNITED STATES COURT OF CUSTOMS APPEALS

## VANDEGRIFT & CO. *v.* UNITED STATES (No. 1700).[1]

1. CONSTRUCTION, PARAGRAPH 235, TARIFF ACT OF 1913—HISTORY OF PARAGRAPH AS AID TO—PEPPER.

Paragraph 235, tariff act of 1913, classifies peppers of all kinds, at least such as are, generally speaking, spices. This is made quite certain by the fact that, to those peppers made dutiable by preceding acts, this paragraph adds pepper, black or white, which theretofore had been given free entry.

2. CONSTRUCTION, PARAGRAPH 235, TARIFF ACT OF 1913—ESTABLISHED PRACTICE AS AID TO—PAPRIKA.

An established administrative practice of classifying paprika as capsicum or red pepper under former tariff acts, the precise language of the former acts having been reenacted by paragraph 235, tariff act of 1913, furnishes reason for so classifying it under the act of 1913.

3. PAPRIKA—CAPSICUM OR RED PEPPER.

Paprika, not being provided for eo nomine by the tariff act of 1913, being in fact a capsicum or red pepper, and not being shown to be commercially designated otherwise, is dutiable as such under paragraph 235, tariff act of 1913. Being ground, it is subject to the additional ad valorem duty of 20 per cent imposed by the paragraph on ground spices. It is not classifiable under paragraph 385 as a nonenumerated article, unmanufactured, or in whole or in part manufactured.

United States Court of Customs Appeals, April 2, 1917.

APPEAL from Board of United States General Appraisers, G. A. 7854 (T. D. 36163).

[Affirmed.]

*Comstock & Washburn* (*Albert H. Washburn* and *J. Stuart Tompkins* of counsel) for appellants.

*Bert Hanson*, Assistant Attorney General (*Samuel Isenschmid*, special attorney, of counsel), for the United States.

[Oral argument Oct. 31, 1916, by Mr. Washburn and Mr. Hanson.]

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

BARBER, Judge, delivered the opinion of the court:

The merchandise in this case is the dried pod of the Spanish paprika or pimenton (the same thing), imported in a finely ground condition, assessed by the collector and held dutiable by the Board of General Appraisers at 1 cent per pound and 20 per cent ad valorem in addition under paragraph 235 of the act of 1913, which we here insert:

235. Spices, unground: Cassia buds, cassia, and cassia vera; cinnamon and cinnamon chips; ginger root, unground and not preserved or candied; nutmegs; pepper,

---

[1] T. D. 37121 (32 Treas. Dec., 390).

black or white; capsicum or red pepper, or cayenne pepper; and clove stems, 1 cent per pound; cloves, 2 cents per pound; pimento, ¾ of 1 cent per pound; sage, ½ cent per pound; mace, 8 cents per pound; Bombay or wild mace, 18 cents per pound; ground spices, in each case, the specific duty per pound enumerated in the foregoing part of this paragraph for unground spices, and in addition thereto a duty of 20 per centum ad valorem; mustard, ground or prepared, in bottles or otherwise, 6 cents per pound; all other spices not specially provided for in this section, including all herbs or herb leaves in glass or other small packages for culinary use, 20 per centum ad valorem.

The theory of assessment evidently was that this paragraph provides, first, for certain unground spices among which is capsicum or red pepper, or cayenne pepper, at the specific rate of 1 cent per pound; and, second, for the same articles when ground at the same specific and an additional 20 per cent ad valorem duty, it having been considered that the merchandise was capsicum or red pepper, ground.

The paragraph also provides for "all other spices" not specially provided for at the 20 per cent ad valorem rate only.

There are four protests of record.

One objection to the assessment in each is that the merchandise is not a spice in an unground state but a vegetable, not becoming a spice until it is ground and that therefore the provision for unground spices in the paragraph does not apply. Three protests claim that the merchandise is dutiable at only 1 cent per pound as capsicum or red pepper under paragraph 235, one that it is dutiable at 1 cent per pound, and all in the alternative that it is dutiable at 20 per cent ad valorem under the last clause thereof.

In two protests claims are made for classification under paragraph 385 which relates to nonenumerated articles unmanufactured or in whole or in part manufactured.

The protests contain other allegations which it is not necessary to mention.

The claim that the merchandise is capsicum or red pepper under the first part of the paragraph is not relied upon and could not well be, because it rests upon the theory that the merchandise is unground, while the fact is otherwise.

In this court the contention first made is under paragraph 385. We conclude from the opinion of the board that this claim was not seriously insisted upon before it. If sustained here it can only affect the merchandise covered by two of the protests. Respecting this issue the importers argue that four witnesses out of the nine who were called by them testified that the Spanish variety of paprika is used mainly as a coloring matter in the manufacture of sausage, catsup, soups, etc.; that this testimony is undisputed; that it therefore follows that the importation is not a spice or anything else that is provided for in paragraph 235, but, having been prepared and ground, is a nonenumerated manufactured article.

The testimony referred to at first blush seems to support the argument, but on further examination of the record it appears that one of the same witnesses, a manufacturer of spices and sundry goods and a wholesaler thereof, also testified that paprika was recognized as a spice; that another, a wholesaler who was in the spice and herb business and therein handled paprika, said, to use his own language, that he "only sold to the pork trade," in which trade it was used for coloring purposes; and that another, who represented a concern reputed to be the largest importers of crude spices in the United States, testified that they handled merchandise like that in question here and that the trade or part of it called it a spice.

In addition to this, another, not one of the four relied on, testified that paprika was regarded as a spice, and still another that in its ground state it was "used as a spice because it has a flavor or a condiment," and that it was known in the trade as one variety of spice when in the ground state, as are the official exhibits before us.

We think this claim must, upon the whole record, be denied.

The next contention of the importers is that the uncontroverted evidence establishes that according to the general and uniform trade understanding, the merchandise involved in these protests is not capsicum, or red pepper, or cayenne pepper of any kind, but on the contrary is a distinctive and separate article known in the spice trade as paprika or pimenton; that the board's classification thereof as capsicum or red pepper, ground, can not stand, and therefore that it should be classified under the "all other spices" provision in the last part of paragraph 235.

As to this claim, we do not think the importers have shown that the merchandise is not commercially "capsicum or red pepper, or cayenne pepper."

They have shown that its commercial designation is paprika. That "paprika" is a foreign word meaning pepper is established by the record. It is also established that at least two varieties of paprika—the Spanish and the Hungarian—are subjects of commerce and imported into this country. Each is a red pepper of the capsicum family, the Spanish variety being what is often referred to as "sweet red peppers" or "sweet Spanish peppers."

Spanish paprika in its physical characteristics very closely resembles the Hungarian article, being, however, milder to the taste, and both, the former in a greater degree than the latter, are much less pungent than some other varieties of capsicum. It is, however, a capsicum, and it is also a sweet red pepper in fact.

A sweet apple or sweet red apple would hardly escape classification as an "apple" because of its color or taste unless the common meaning of "apple" were limited by statute or by trade.

There being no eo nomine provision for paprika, the establishment of the commercial designation of the importations here to be such

must, in order to exclude the same from paragraph 235, be supplemented by proof establishing that in the wholesale trade dealing therewith paprika is excluded from capsicum or red pepper, or cayenne pepper, and this the importers, we think, have failed to do. It is true that witnesses in their behalf have so testified. One, however, admitted that the term "capsicum" had not been used in the trade for four or five years, and another that it was not used in the trade at all, but was known as a word for red pepper.

But it also conclusively appears that it is now, and for several years (as far back in at least one instance as 1909) has been, a practice for wholesalers, some of whom, but not all, do both a wholesale and retail business, to put up for the retail trade and sell either the Hungarian or Spanish paprika or both in small containers labeled "Paprika," "Rosen Paprika," "Rose Red Paprika," etc., followed in each case by the term "sweet red pepper." One of the importers' witnesses explained this by saying that the term "red pepper" was so employed to inform the housewife what the article was, so she would understand it was a sweet red pepper. Another witness in a different connection said that the term "sweet red pepper" was used by certain manufacturers because the Department of Agriculture maintained that "paprika" was a misnomer for the article.

It also appears that shipments of paprika to this country under the act of 1909 were made in containers labeled both "Rosen paprika" and "red pepper" with no words of limitation.

We are not unmindful that wholesalers *might* among themselves exclude paprika from the term "red pepper." But the common employment of that term by them in the retail trade with no further explanation therefor than what has been given suggests to us that they use it in the wholesale trade also and is consistent therewith. At any rate it tends to so far weaken the proof of commercial designation that we decline to be persuaded on the whole record that such designation has been established, as claimed by the importers.

It is further claimed that the term "capsicum or red pepper, or cayenne pepper," must be interpreted in a sense that differs from its ordinary meaning by reason of the decision in Cruikshank *v.* United States (59 Fed., 446), decided in January, 1894, in connection with the subsequent legislative history of the pepper provisions.

We have carefully examined the case and the statutes and do not adopt this conclusion. We find nothing therein which warrants us to give to the quoted term any other than its common meaning, which clearly includes the merchandise here. Indeed, the fact that the importers so understand might at least be inferred from the claim in their protests that the merchandise was capsicum, or red pepper. It is true that this claim turns out to be inapplicable, because these peppers are not unground; but if the importers had not been mistaken as to the condition of the peppers in that respect, it would be quite

consistent with the fact as we find it. This, however, is not regarded as important or in any sense controlling.

Recurring to paragraph 235, we think the pepper provisions therein indicate a congressional intent to classify thereunder peppers of all kinds, at least such as are, generally speaking, spices. This conclusion is made quite certain when we consider that to articles dutiable as pepper under preceding acts paragraph 235 adds pepper, black or white, which theretofore had been given free entry.

As an independent ground for sustaining the judgment below the Government claims to have shown a long administrative practice of classifying paprika as capsicum or red pepper. With reference thereto an examiner at the port of Philadelphia testified that for at least the last 10 years Hungarian paprika had at that port been classified as the Government claims.

This practice seems to have been confirmed by the rulings of the board under the act of 1897 in G. A. 3691 (T. D. 17643), G. A. 4390 (T. D. 20886), G. A. 6248 (T. D. 26957), Abstract 22126 (T. D. 30111), Abstract 22373 (T. D. 30208). See also G. A. 6667 (T. D. 28427). Spanish paprika was likewise so classified by the board in Abstract 27185 (T. D. 32631) under the act of 1909.

We do not feel warranted on the record here to say that Spanish paprika shall be differentiated from the Hungarian product. To do this involves a classification based upon degrees of pungency which would at once invite confusion and uncertainty.

Congress will be presumed to have enacted the paragraph with knowledge of the interpretation given thereto in the preceding acts. The precise language, construed and applied as above indicated, has been reenacted, and we think this case fails to show a sufficient reason for a different interpretation.

While this may not preclude importers from establishing a commercial designation that warrants a different classification, we think in the present case the attempt to do so has failed.

The judgment of the Board of General Appraisers is *affirmed.*